IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.  Criminal Action No. 3:21-cr-18

DELVONTE E. HARRIS,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on DEFENDANT'S SECOND MOTION TO SUPPRESS EVIDENCE[1] ("Motion to Suppress") (ECF No. 15). For the reasons set forth below, the Motion to Suppress will be denied.

## BACKGROUND

On March 2, 2021, the Defendant, Delvonte E. Harris, was indicted for one count of Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1). INDICTMENT, ECF No. 1. The Indictment alleged that, on or about July 21, 2020, Harris, a convicted felon, knowingly and unlawfully possessed a firearm and ammunition. Id. On April 2, 2021, Harris filed a motion to suppress (ECF No. 11) the firearm because of an allegedly unconstitutional search and seizure. On April 7, 2021, the Court

---

[1] The Defendant previously submitted DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND MEMORANDUM IN SUPPORT (ECF No. 11). The filing of the second motion (ECF No. 15) rendered the original motion (ECF No. 11) moot, and thus, the original motion has been denied as moot. See ORDER, ECF No. 19.

held an evidentiary hearing on that motion to suppress. In light of the evidence presented at the hearing, Harris submitted a second motion to suppress (i.e., the Motion to Suppress currently before the Court), which requested the suppression of the firearm <u>and</u> statements made by Harris. The following facts are derived from the evidence presented at the hearing held on April 7.

At approximately 7:00 AM on July 21, 2020, a 911 call was made[2] to report a nonresponsive person in a running vehicle. Hearing Tr. 4:23-24, ECF No. 14. Officers of the Richmond Fire Department ("RFD") and Richmond police officers J. Deras, T. Gayle, and P. Ziolkowski responded to that call. Hearing Tr. 4:20, 5:5-8, 33:20-22, ECF No. 14; REPORTING OFFICER NARRATIVE, ECF No. 11-1. By all accounts, the RFD officers were first on the scene, followed shortly by Officers Deras and Gayle; Officer Ziolkowski was the last to arrive. Hearing Tr. 5:5-6, 34:17, ECF No. 14. It should be noted that Deras and Gayle employed their vehicle's emergency lights and siren while on route to the scene. Hearing Tr. 34:10-12, ECF No. 14.

When the police officers first arrived at the scene, they observed a vehicle parked on the street at an angle to the curb with the taillights on. Hearing Tr. 5:11-14, 34:19-20, ECF No.

---

[2] The identity of the 911 caller is not in the record, but neither party made an issue of it.

14. The front of the vehicle was near the curb, but the back of the vehicle was "a little more positioned out into the street." Hearing Tr. 5:17-19, ECF No. 14. The car had two flat tires but no other obvious damage. Hearing Tr. 18:7-13, ECF No. 14. The driver's side door was open, and Harris was sitting in the driver's seat, slumped toward the center console, with his left foot outside the car and his right foot seemingly placed on the brake pedal. Hearing Tr. 6:3-6, 35:10-12, ECF No. 14.

Although RFD officers were also on the scene, the police officers were responsible for "render[ing] the scene safe to make sure that" it was "safe for [the] fire [department], and if EMS was there, to then go in and begin dealing with the patient or the subject." Hearing Tr. 15:8-13, 34:17, ECF No. 14. Accordingly, Deras approached the vehicle and tried to wake Harris by speaking to him, but Harris did not immediately respond. Hearing Tr. 35:18-22, ECF No. 14. Deras then tried to wake Harris by shaking his arm. Hearing Tr. 35:23-36:4, ECF No. 14. Harris still did not wake up,[3] Hearing Tr. 36:10-11, ECF No. 14, but when shaking Harris,

---

[3] The Reporting Officer Narrative (ECF No. 11-1) states that "Delvonte Harris during questioning admitted to taking Zynax [sic] earlier that morning, along with drinking alcohol." Having reviewed the body-worn camera footage, the Court believes Harris said "Xanax." In any case, that information was not known to the officers when they were attempting to rouse Harris, though it does corroborate the officers' descriptions of Harris as "incoherent" and "not very lucid."

3

Deras noticed that there was a knife[4] in the Defendant's "lap area." Hearing Tr. 36:7-20, ECF No. 14. When Deras tried to check the knife, it seemed to be stuck. Hearing Tr. 37:6-10, ECF No. 14. So, Deras stopped touching the knife in case it was actually stuck in Harris. Hearing Tr. 37:10, ECF No. 14.

By this point, Ziolkowski had arrived on the scene, and the officers worked together to further investigate what was going on. Hearing Tr. 37:16-17, ECF No. 14. Deras and Gayle secured the Defendant's arms, while Ziolkowski lifted Harris' sweatshirt to see if the knife was stuck in Harris' stomach.[5] Hearing Tr. 37:23-38:1, ECF No. 14.

At that point, Harris began "to make some motions, some movement," and he "was starting to become a little more coherent or coming to," though he was still not entirely lucid.[6] Hearing Tr. 7:18, 8:8, 21:2-3, 26:23-27:6, 27:18-25, 38:14-18, 39:3-13, ECF No. 14. Harris was able to respond to the officers enough to convey that the knife was not stuck in him, just clipped to his

---

[4] The knife in question was camouflage-colored with a knuckle handle, but there is no evidence in the record that it was illegal for Harris to have the knife. Hearing Tr. 16:19-18:2, ECF No. 14.

[5] Ziolkowski testified that he did not see any blood on or around Harris' body, but he also stated that he believed it was possible for an individual to be stabbed even if no blood was immediately visible. Hearing Tr. 31:16-32:17, ECF No. 14.

[6] That said, Harris was not reported to be angry or combative. Hearing Tr. 22:1, ECF No. 14.

4

pants. Hearing Tr. 51:5-16, ECF No. 14. Once it was clear that the knife was not in Harris, the officers took the knife outside the car and asked Harris to step out of the vehicle. Hearing Tr. 7:21-8:2, ECF No. 14.

Deras testified that Harris was asked to exit the vehicle so the officers could "make sure he wasn't hurt and further investigate what was happening." Hearing Tr. 39:20-22, ECF No. 14. Deras testified that, at the time, he considered Harris a dangerous person because Harris was "not all there" and the officers "had already found one weapon on him." Hearing Tr. 40:15-19, ECF No. 14. Ziolkowski also testified that, at the time, he thought Harris might have been under the influence of alcohol or drugs. Hearing Tr. 26:23-27:6, 27:18-25, ECF No. 14. Considering Harris' speech and conduct, as depicted on the body-worn camera footage, that was a reasonable observation.

Once out of the car, Harris began moving his hands towards the front of his sweatshirt, and the officers directed him to stop.[7] Hearing Tr. 8:15, 8:22-24, 40:2-6, 40:9-19, ECF No. 14. Deras had Harris place his hands on his head and then Deras conducted a pat down, during which he felt a bulge in Harris' waist area. Hearing Tr. 8:22-24, 40:9-19, 40:22-25, 41:1-5, ECF No. 14.

---

[7] At the evidentiary hearing, Harris argued that he was merely trying to pull up his pants, which had fallen down in the back. Hearing Tr. 23:18-25:2, ECF No. 14. The video recording supports the officers' perception.

5

Even before Deras actually saw the item, it was clear from its size that it could not have been "a cell phone or something else [one] might normally find on somebody's waist[.]" Hearing Tr. 40:22-25, ECF No. 14. Deras asked Harris what the bulge was, and Harris said, "[I]t's protection." Hearing Tr. 42:7-12, ECF No. 14. Deras asked what that meant, and Harris said it was a gun. Hearing Tr. 42:7-12, ECF No. 14. Deras asked if Harris had a concealed-carry permit, and Harris said no. Hearing Tr. 42:16-17, ECF No. 14. Deras then put Harris in handcuffs. Hearing Tr. 42:20-21, ECF No. 14. Deras ultimately recovered a "handgun with a large capacity magazine" that had been stuck in Harris' waist area but covered by his sweatshirt. Hearing Tr. 8:24, ECF No. 14.

Harris now seeks to suppress "all evidence obtained after this illegal seizure . . . and any statements made to the police which were taken in violation of his Fourth Amendment rights and in violation of his Fifth Amendment rights under Miranda v. Arizona."[8] Mot. to Suppress at 4, ECF No. 16.

**DISCUSSION**

A. **Applicable Law**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against

---

[8] Neither party briefed the Miranda issue, and it is not clear which statements the Defendant would like to suppress. At this time, the Court will deny Defendant's Miranda claim without prejudice.

6

unreasonable searches and seizures." U.S. CONST. amend IV. Accordingly, the default rule is that law enforcement must obtain a warrant, grounded in probable cause, before seizing or searching individuals. United States v. Yengel, 711 F.3d 392, 396 (4th Cir. 2013). There are, however, several exceptions to the warrant requirement. United States v. Currey, 965 F.3d 313, 321 (4th Cir. 2020). Two exceptions are of particular relevance for this case: the exigent circumstances exception and the investigatory stop (or Terry stop) exception. Where law enforcement seize or search an individual without a warrant and under circumstances in which no exception to the warrant requirement applies, the Fourth Amendment is violated, and the evidence found as a result of the violation must be suppressed. Wong Sun v. United States, 371 U.S. 471, 484-85 (1963).

1. **Exigent Circumstances**

Law enforcement officers are generally required to obtain a warrant before searching an individual's home or person "unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Brigham City v. Stuart, 547 U.S. 398, 403 (2006) (quoting Mincey v. Arizona, 437 U.S. 385, 393-94 (1978)). One well-grounded "exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." Brigham City,

7

547 U.S. at 403. Although the exigent circumstance exception has most often been applied to the warrantless entry of a home, the Court is not aware of any reason it could not apply to a seizure of a person if the circumstances were sufficiently exigent to justify a warrantless seizure. See United States v. Currey, 965 F.3d 313, 330 (4th Cir. 2020) (en banc) ("To be sure, we do not suggest that the exigency doctrine may never apply in the Terry context."); see also United States v. Johnson, 410 F.3d 137, 141-42, 144-45 (4th Cir. 2005) (finding no Fourth Amendment violation following officer's warrantless entry into a car after a traffic accident to assess occupant's medical condition).

But, the exigent circumstances exception only applies in the case of a "true 'emergency.'" Currey, 965 F.3d at 322. To "determine whether a given emergency justifies officers bypassing a Fourth Amendment protection," a court should look at whether the officer's actions were objectively reasonable and grounded in specific, articulable facts. Currey, 965 F.3d at 322. The subjective motivations of the officers are irrelevant. Brigham City, 547 U.S. at 406.

### 2. Terry Stops

Similarly, if a police officer has a reasonable articulable suspicion that an individual is or was involved in criminal activity or that such activity is afoot, then, even without a warrant, a brief investigative seizure to determine the identity

8

of the individual "or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." Adams v. Williams, 407 U.S. 143, 146 (1972); United States v. Kehoe, 893 F.3d 232, 237 (4th Cir. 2018). The key is that there must be specific, articulable, objective facts - known to the officer at the time of the seizure - such that a reasonable officer would think that the individual was or had been involved in criminal activity. Kehoe, 893 F.3d at 237. The reasonableness inquiry is based on the totality of the circumstances. Kehoe, 893 F.3d at 237. And, "[t]he Government bears the burden of proving that reasonable suspicion justified a warrantless seizure." Kehoe, 893 F.3d at 237.

Where an officer has a reasonable, articulable suspicion that "the person whom he had legitimately stopped might be armed and presently dangerous," a limited search for weapons is appropriate. Pa. v Mimms, 434 U.S. 106, 111-12 (1977) (per curiam). But, of course, "the stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" United States v. Brignoni-Ponce, 422 U.S. 873, 881 (1975) (quoting Terry v. Ohio, 392 U.S. 1, 29 (1968)). Reasonableness depends on balancing the public interest with "the individual's right to personal security free from arbitrary interference by law officers.'" Mimms, 434 U.S. at 109 (quoting United States v. Brignoni-Ponce, 422 U.S.

9

873, 878 (1975)). That said, it would "'[c]ertainly . . . be unreasonable to require that police officers take unnecessary risks in the performance of their duties.'" Mimms, 434 U.S. at 109 (quoting Terry v. Ohio, 392 U.S. 1, 23 (1968)).

B. Analysis

It is beyond dispute that the officers did not have any kind of warrant when they first encountered Harris.[9] The question, then, is whether the conduct of the officers falls within one of the exceptions to the normal Fourth Amendment warrant requirement. Two such exceptions are at issue in this case: (1) the exigent circumstances exception and (2) the exception for brief, investigatory stops (i.e., Terry stops).[10]

1. Exigent Circumstances

Here, the officers' contact with Harris is covered by the exigent circumstances exception. The officers responded to the scene (with their lights and sirens in operation) around 7:00 AM

---

[9] The lack of a warrant is hardly surprising under the circumstances. "Where police behavior falls outside the criminal justice rubric . . . warrants and the probable cause standard are inapposite. . . . The questions appropriate to a warrant application – probable cause of what crime? search of what premises? seizure of what items? – simply have no application in this case because the officer was responding to a noncriminal emergency." United States v. Taylor, 624 F.3d 626, 630 (4th Cir. 2010).

[10] The Court will not view this case from the lens of the so-called "community caretaker exception" in light of the Supreme Court's recent decision in Caniglia v. Strom, 593 U.S. ___ (2021).

10

because of a 911 dispatch reporting a non-responsive person in a running vehicle. When they arrived, they found a non-responsive individual in the driver's seat (but slumped over the center console) of an improperly parked car with two flat tires. The driver had one foot on the brake and one foot outside the car, and he was not immediately responsive to the officers' attempts to rouse him. On those facts, an objectively reasonable officer would have thought that something was very amiss and that the driver was likely in need of emergency aid — particularly because while attempting to rouse the individual, the officers saw that the handle of a knife seemed to be jutting out from the driver's stomach area. Under these circumstances, the exigent circumstances exception clearly applies, and the officers did not violate Harris' Fourth Amendment rights by holding his arms still while they better investigated what was going on.

Moreover, once the officers became aware of the knife in Harris' lap, it was not unreasonable for the officers to conduct a brief pat down for their safety. See Mimms, 434 U.S. at 111-12.

2. **Terry Stop**

Furthermore, even if the exigent circumstances ended before the officers asked Harris to exit his vehicle, the officers' conduct would, nevertheless, still constitute a valid Terry stop. By the time that Harris was asked to exit his vehicle, the officers

11

had a reasonable, articulable suspicion that Harris was engaging, or had recently engaged, in criminal activity. In Virginia, it is illegal for anyone to drive or operate a motor vehicle while under the influence of alcohol or any narcotic drug "to a degree which impairs his ability to drive or operate any motor vehicle" safely. Va. Code § 18.2-266. When officers arrived, Harris was passed out in the driver's seat of a vehicle with two flat tires, improperly parallel parked at angle to the curb. He had one foot on the brake pedal and one foot on the ground outside the car. He was also non-responsive when officers first tried to rouse him and not coherent once he awoke. An objectively reasonable officer would clearly have a reasonable, articulable suspicion that Harris had been driving under the influence of alcohol or narcotics. Moreover, as explained above, once the officers established that Harris had a knife on his person, they were justified in subjecting Harris to a brief pat down outside the vehicle for their own safety. See Mimms, 434 U.S. at 111-12. Because the conditions for a Terry stop were met, even if the exigent circumstances exception did not apply, Harris' Fourth Amendment rights were, nevertheless, not violated.

## CONCLUSION

For the foregoing reasons, the DEFENDANT'S SECOND MOTION TO SUPPRESS EVIDENCE ("Motion to Suppress") (ECF No. 15) will be denied as to the suppression of physical items. Although the

motion seeks suppression of statements, it does not identify which statements are sought to be suppressed so the Court cannot assess the merits of that aspect of the motion.

/s/ REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: June 10, 2021